IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EARL KEVIN MOORE, AI1353,

    Petitioner,

  v.

ERIC ARNOLD, Warden

    Respondent.
                               /

No. C 15-1907 CRB (PR)

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

     Petitioner, a state prisoner incarcerated at California State Prison, Solano in Vacaville, California, has filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging a conviction from Alameda County Superior Court. For the reasons set forth below, the petition will be denied and a certificate of appealability will not issue.

**I.    STATEMENT OF THE CASE**

     On May 9, 2011, a jury in Alameda County Superior Court convicted Petitioner of two counts of forcible oral copulation in concert, penetration with a foreign object, and attempted rape by a foreign object in concert. After the jury returned its verdict, the trial court found that allegations of recidivist enhancements for two prior manslaughter convictions were true. The trial court sentenced Petitioner to two consecutive terms and two concurrent terms of 25 years to life. With the addition of the recidivist enhancements, Petitioner's total unstayed term was 60 years to life.

Petitioner appealed and filed a petition for a writ of habeas corpus claiming ineffective assistance of counsel in the California Court of Appeal.  On November 6, 2013, the court of appeal reversed the conviction of attempted rape by a foreign object in concert and held that one of the recidivist enhancements should not be imposed, but otherwise affirmed the judgment of the trial court.  The court of appeal also denied the petition for a writ of habeas corpus, explaining that Petitioner had not established prejudice from trial counsel's alleged deficient performance.

On June 15, 2014, the California Supreme Court denied review in both the appeal and habeas corpus cases.

On April 29, 2015, Petitioner filed the instant petition for a writ of habeas corpus under 28 U.S.C. § 2554, raising several claims of ineffective assistance of counsel.

On June 10, 2015, this Court found that the petition appeared to state cognizable claims under § 2254 and ordered Respondent to show cause why a writ of habeas corpus should not be granted.  Respondent filed an answer to the order to show cause and Petitioner filed a traverse.

## II.   FACTUAL BACKGROUND

The California Court of Appeal summarized the facts of the case as follows:

**A.   The Prosecution Case**

   1.   The Victim's Account

Moore and the victim, A. Doe, had known each other for several months before the events at issue in this case. On September 24, 2010, shortly before midnight, Doe phoned Moore after she had had an argument with her boyfriend. Moore drove to a location in Richmond, where they had agreed to meet, and picked her up. Moore asked Doe for oral sex, but Doe said she would not do this in the car, and agreed to go with Moore to a residence in Fremont.

Moore drove with Doe to the home of Lashonda Pleas. When they arrived, Moore, Doe, and Pleas went to an upstairs bedroom. Pleas left to go to a store and, while she was gone, Moore and Doe had consensual sex. Pleas then returned.

Doe told Moore and Pleas that she could not have sex with Pleas present. Moore told Doe, "You got to do her. You have to go down on her." Doe refused, but Moore pushed her back on the bed as she tried to get up and told Doe that she and Pleas were going to "do" each other. As he held Doe down on the bed, Moore told Pleas to open Doe's legs and Pleas tried

2

unsuccessfully to do so. Moore then maneuvered Doe's legs up and back while Doe was "hollering and screaming and fighting." Pleas then placed her mouth on Doe's vagina.

Pleas's two sons, who were in the residence, heard the screaming and forced open the door to the bedroom. Moore told the young men that "everything is all right" and as Moore and Pleas talked with them, Doe dressed and ran outside. Doe used her cell phone to leave messages with several people. One of these people was Wanda Lattier, who testified that in the voicemail message, Doe sounded scared, said she was with a man named "Kevin," and gave a car license number.

Pleas then came outside and told Doe everything would be all right. Pleas asked if Doe smoked crack and Doe said that she did. Pleas offered to make Doe a crack pipe and Doe went back into the house, and returned with Pleas to the bedroom. Doe then smoked crack cocaine from a pipe that Pleas constructed. Doe stated that she was not surprised that crack was there because Moore had previously told her that he was selling or using it.

As Doe smoked, Moore told her that he would make her have sexual contact with Pleas. Doe refused and threw the pipe. Moore told Doe that she was being disrespectful and pushed her back onto the bed. Doe was "fighting and wrestling," saying "Please don't do it. Please stop." Moore pulled Doe's pants down from back and inserted three fingers into Doe's anus, telling her she was going to "do it." As Moore did this, Pleas positioned her vagina close to Doe's face. Doe experienced pain from Moore's fingers in her anus and she was "hollering and screaming, telling him, no." Eventually, against her will, Doe put her mouth on Pleas's vagina. After Doe told Moore that she had done so, Moore told her that she would have to continue and that he was going to be forced to kill her because she was fighting him.

During the struggle, Moore began to stuff Doe's shirt into her mouth because she was yelling. He hit her on the side of her face and told her to be still. Moore told Pleas to get a rope and Pleas brought a cell phone charger cord. Moore threw it and said he had asked for rope. Moore then told Pleas he was going to "stick something in her" and directed her to find something. Pleas came back with a plastic water bottle. Moore then tried to insert the bottle into Doe's vagina, but was unsuccessful because Doe kept her legs tightly closed. Doe continued to scream and begged Moore to let her go.

Pleas's sons again came into the room and asked what was happening. Doe gathered her things, begged the sons to call the police, and went into a bathroom, where she saw that her face was bleeding. Doe then ran out of the house. She saw a car pulling into a nearby driveway and she asked the owner to call the police, which he did. One of Pleas's neighbors, Kevin Kohn, identified himself as the owner of the car and confirmed that he called the police for Doe, who appeared very upset.

Police Officer Lindsay Snyder responded to the call and described Doe as being "visibly upset, crying." Doe gave limited answers and was "hysterical."

3

#### 2. Doe's Injuries

The jury was shown photos, taken of Doe after the police came, depicting injuries to Doe's face and eyes and bruises on an arm. Doe testified that Moore caused these injuries.

Betty Noey, a registered nurse, examined Doe on September 25, 2010. Noey observed redness on Doe's left upper arm and bruising on her right thigh and left inner leg. There was tenderness on multiple areas of Doe's head, and swelling of her right cheek. The right part of Doe's nose was swollen and there was a suction injury on her left cheek. There was also tenderness on the right side of the neck. The vaginal examination showed a white discharge.

During the examination, Doe related sexual acts that included penetration of the anus with the fingers, and attempted penetration of the anus with the penis. She did not have signs of bruising or bleeding at her anus, but that did not mean she could not have been penetrated with fingers.

#### 3. Pleas's Account

Pleas, who had entered a plea to reduced charges in exchange for truthful testimony, testified that she had been involved in a sexual relationship with Moore for six years. She described Moore as an abuser who would physically assault her. Moore had punched her, slapped her, kicked her, and twice had tried to run her over with his car. Moore threatened to kill her if she left him.

Pleas's description of the incident was consistent with Doe's regarding the use of force and Doe's repeated refusal to participate in oral sex with Pleas. After Moore and Doe arrived at her residence, she went to the store. When she returned, Moore wanted Pleas to perform oral sex on Doe, and when Doe said she did not do that with women, Moore tried to pry open her legs. Moore eventually maneuvered Doe's legs over her head and Pleas complied with Moore's direction to perform oral sex on Doe.

When Pleas's sons broke into the room, Moore told them he was not hitting Pleas. Doe then left. Pleas went outside, saw that Doe was upset, and they discussed smoking crack. Doe returned to the house, where Moore gave her crack.

After Doe smoked the crack, Moore told her that she was going to perform oral sex on Pleas. Doe refused, but Moore put Doe's head between Pleas's legs. Doe was crying and Moore put his fingers in Doe's anus. Doe asked Moore to stop and seemed to be in pain.

Pleas testified that Moore told her to get a bottle, but did not say why he wanted it. She gave him a bottle and then left the room. When Pleas returned, Doe was on the floor and Moore was on top of her. It appeared to Pleas that Doe and Moore were struggling. Doe was crying and Moore told her to be quiet. One of Pleas's sons returned to the room and Doe left the house.

Pleas stated that she did not want to have sexual contact with Doe, but complied with Moore's demands because she was afraid of him, stating that "[Moore] hits me and yells . . . if I say no." During their relationship, Moore had asked other women to have sexual contact with Pleas. On more than five occasions, Moore forced a woman named Kimberly, now deceased, to engage

4

in oral sex with Pleas. Pleas and Kimberly would refuse, but Moore would beat them with a belt or would throw objects at them. With other women, Moore would offer them drugs and then ask them to perform oral sex with Pleas. If a woman refused, Moore would slap her and on "a couple" of occasions, Moore forced the women to do what he wanted. Pleas believed that when Moore and Doe first had sex, it was consensual, but that the later sexual activity was nonconsensual.

Pleas's son heard yelling and screaming from his mother's bedroom that night and forced open the door, concerned for his mother's safety.

He told the police he did not want to testify against Moore because of concerns for the safety of his family. He was afraid of Moore because Moore bragged to him of murdering someone. The son denied seeing another woman in the room with Moore and his mother. He saw the other woman only later, after the police arrived.

**B.    The Defense Case**

Moore testified on his own behalf. He admitted that he had prior convictions for possession of a controlled substance for sale and that he had sustained two convictions for voluntary manslaughter. He described the facts of the manslaughter offenses as occurring during a struggle with two men who were armed.

Moore admitted that he had a sexual relationship with Pleas. He stated that on five occasions a third person was involved in sexual relations with him and Pleas. Kimberly and Doe were among the parties involved.

On the day of the incident he met with Doe and took her to Pleas's house in Fremont. On the way there they were drinking and Doe was concerned about how she could smoke crack because she had lost her pipe. Doe also agreed to perform oral sex on Moore during the drive to Fremont. When they arrived at Pleas's house, Moore, Pleas, and Doe went upstairs into the bedroom. Pleas then left to go to a store. While Pleas was out, Moore and Doe had sex.

After Pleas returned, Doe smoked crack and Moore asked Doe if she was ready to have sex again. Doe said that she was ready and Moore positioned her on the bed with her legs pulled back. Pleas then began to perform oral sex on Doe, while Doe performed oral sex on Moore. No physical confrontation occurred at this point.

Doe then smoked some more crack, after which Doe and Moore engaged in vaginal sex. Moore asked Pleas for some lotion and began rubbing it into Doe to prepare her for anal sex. While Moore penetrated Doe's anus with his finger to lubricate her, he asked Doe to perform oral sex on Pleas, but Pleas said she was not ready yet. Pleas moved down on the bed so that Doe's head was between her legs and Moore asked Pleas if Doe had performed oral sex. Pleas said that Doe had not, but Doe said that she had.

Moore denied that he hit Doe or forced her to have sex. Instead, he encouraged her to have sexual contact with Pleas by offering her more crack. Moore then penetrated Doe's anus with his penis, but Doe said it hurt and she leapt off the bed and started to put her clothes on. When she was partially dressed, Moore pulled her down to the floor with him and asked her to allow

5

him to have sex with her again. Doe asked for more crack and Moore said he would get it, but Doe started "hollering."

Pleas's sons, who were intoxicated, forced the bedroom door open and Moore told them that everything was all right and left the bedroom to talk with them on the stair landing. Moore said that he and Pleas's sons remained on the landing, talking, for a "couple hours at least."

Pleas left the house to go to the store again and Moore returned to the bedroom and asked Doe if she wanted to finish having sex. Doe asked Moore if he had more crack and Moore told her to wait until Pleas returned. When Pleas returned, Moore told Doe she would have to wait for crack because he didn't have any more. Doe then "got hostile" and said she was leaving. Moore gathered her clothes and pushed them into her hand and Doe "started flailing with both hands" at him. Moore struck out at her "out of reflex" and hit her once in the face with his fist. Doe then went into the bathroom and dressed.

When Doe left the bathroom, Moore told her he would take her back to Richmond. As they were walking out of the house, Doe "took off to the right and started yelling, help, help, somebody help me."

People v. Moore, No. A133224, 2013 WL 5936676, at **2–5 (Cal. Ct. App. Nov. 6, 2013).

## III.  STANDARD OF REVIEW

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412–13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct

6

governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings, as opposed to the dicta, of the Supreme Court as of the time of the state court decision. Id. at 412; Lambert v. Blodgett, 393 F.3d 943, 974 (9th Cir. 2004). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Lambert, 393 F.3d at 974 (citation omitted).

"It is settled that a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents.'" Nevada v. Jackson, 133 S. Ct. 1990, 1992 (2013) (citing Harrington v. Richter, 562 U.S. 86, 101 (2011)).

**IV.   DISCUSSION**

Petitioner seeks federal habeas relief on the grounds that he was denied his Sixth Amendment right to effective assistance of counsel. Petitioner specifically argues that his trial counsel was ineffective under Strickland v. Washington, 466 U.S. 668 (1984), because: (1) trial counsel improperly impeached Petitioner by questioning Petitioner about his prior convictions, which "opened the door" for a "hungry and vicious prosecutor to devourer" (sic) Petitioner; (2) in his opening statement, trial counsel introduced Petitioner to the jury as "one

7

of those people that you love to hate," which "effectively demoniz[ed]" Petitioner; (3) trial counsel failed to challenge an improper sentence enhancement at Petitioner's sentencing; and (4) trial counsel failed to correct a jury instruction regarding count four (attempted rape by foreign object in concert). Pet. at 6.2–6.4.

Petitioner also argues that prejudice should be presumed as a matter of law under United States v. Cronic, 466 U.S. 648 (1984), because trial counsel "entirely fail[ed] to subject the prosecution's case to a meaningful adversarial testing." Pet. at 6.4.

### A. Applicable Federal Law

#### 1. Strickland v. Washington

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel which guarantees not only assistance, but effective assistance of counsel. Strickland, 466 U.S. at 686. A meritorious claim of ineffective assistance lies where the petitioner's counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. Id.

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must show (1) that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms, and (2) that petitioner was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 687–88, 694.

To meet Strickland's first prong, a petitioner must show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. at 687. To do this, a petitioner must show that counsel's representation fell below an objective standard of reasonableness. Id. at 688. The relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable. See Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998). Judicial

scrutiny of a counsel's performance is highly deferential, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (citation omitted).

Strickland's second prong requires a petitioner to show that counsel's errors were so serious as to deprive him of a fair trial, a trial whose result is reliable. Id. at 688. To show prejudice, a petitioner must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different; a reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. at 694. Where the petitioner is challenging his conviction, the appropriate question is "'whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt.'" Luna v. Cambra, 306 F.3d 954, 961 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 695).

When analyzing ineffective assistance of counsel claims under § 2254(d), a federal habeas court employs a doubly deferential standard. Knowles v. Mirzayance, 556 U.S. 111, 112 (2009). For a federal habeas court reviewing a state court's determination, the pivotal question is not whether defense counsel's performance fell below the Strickland standard, but whether the state court's application of the Strickland standard was unreasonable. Harrington v. Richter, 562 U.S. 86, 101 (2011).

          2.        United States v. Cronic

In Cronic, the Supreme Court carved out certain exceptions to the general Strickland rule by holding that in limited circumstances a defendant need not show prejudice. 466 U.S. at 658. Specifically, prejudice may be presumed when a defendant is "denied counsel at a critical stage of his trial," id. at 659, "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," id., or "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption

9

of prejudice that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial," id. at 659–60. But apart from circumstances of this magnitude, "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." Id. at 659 n.26; Young v. Runnels, 435 F.3d 1038, 1043 (9th Cir. 2006).

### B. State Court's Decision

The California Court of Appeal provided the following background to Petitioner's claims of ineffective assistance of counsel:

> In his opening statement, Moore's counsel stated: "In our society there are people that you love to hate. . . . [Moore] is one of those people." Counsel then summarized for the jury the factual background of Moore's two prior manslaughter convictions.
>
> When Moore testified at trial, his counsel asked him about two prior convictions for possession for sale of controlled substances in 1987. Moore admitted these convictions and, on further questioning, briefly described the facts underlying the convictions. Counsel then asked Moore about his two manslaughter convictions in 1990. Moore admitted these convictions and, on further questioning, provided his account of the events that led to those convictions. The prosecutor, on cross-examination, returned to the manslaughter convictions and questioned Moore extensively. Much of the prosecutor's questioning concerned the nature and extent of the gunshot wounds suffered by the two victims.
>
> Moore's defense counsel, in a declaration accompanying Moore's petition, states that he believed the facts of the prior convictions would be admissible and that he made the "tactical decision that it would be best for the defense if I introduced the facts during my opening statement and asked Moore about the facts instead of having the prosecutor elicit the facts for the first time on cross-examination."

Moore, 2013 WL 5936676, at *12 (footnote omitted).

The court then proceeded to reject Petitioner's claims of ineffective assistance of counsel for failure to establish prejudice. The court explained:

> We need not determine whether defense counsel's representation was actually deficient and fell below prevailing professional norms because we conclude that Moore has failed to make a prima facie showing of a reasonable probability that the outcome of his trial would have been different had the jury not heard the factual background of Moore's prior convictions and the prosecutor's cross-examination about those facts and Moore's use of aliases.
>
> Moore's current case concerned sexual offenses that occurred in 2010 and his manslaughter convictions occurred in 1990. The underlying facts of the manslaughter

convictions had nothing to do with the facts of the present case. Although those facts and Moore's use of aliases did not help him, we fail to see how they substantially added to Moore's problem of convincing the jury that his account was credible. That Moore had two manslaughter convictions and prior drug convictions would have come to the jury's attention in any case.

Consent and coercion were the issues before the jury and Doe's credibility would have been the jury's primary focus. Doe's testimony was corroborated by Pleas on all material issues, except for what Moore said that prompted Pleas to hand him the water bottle. While there were discrepancies and inconsistencies between Doe's and Pleas's testimony, jurors understand that witnesses do not have perfect memories and observe events from different perspectives.

Doe's credibility was also enhanced by the testimony of other witnesses. Pleas's son was so alarmed by the yelling and screaming from his mother's bedroom that he forced open the door. Lattier confirmed that Doe had left a voicemail message in which she sounded scared, said she was with a man named "Kevin," and gave a car license number. Kohn, who called the police for Doe after she fled Pleas's house, said that Doe appeared to be very upset. Snyder, a police officer who responded, said that Doe was visibly upset and crying.

We find no reasonable probability that the jury did not accept Moore's account because their deliberations were contaminated by impermissible character assessments prompted by the underlying facts of the prior convictions or Moore's use of aliases. Besides the convincing, corroborated testimony of Doe, the jury had additional reasons to disbelieve Moore.

First, Moore's account did not include Doe leaving Pleas's house and then returning after Pleas talked to her. However, it was while Doe was outside that she left Lattier a voicemail message. Thus, Moore's account conflicted not only with Doe's and Pleas's testimony, but with Lattier's as well.

Second, Moore stated that after Pleas's sons broke into the room, he talked with them on the stair landing for at least two hours. This account conflicted not only with the testimony of Doe and Pleas's, but with that of Pleas's son.

Third, Moore stated that he hit Doe in the face once with his fist, out of reflex after she started flailing at him. While this may have explained the swelling of Doe's right cheek and swollen nose, it did not explain all of nurse Noey's observations, which included redness on Doe's left upper arm, bruising on her right thigh and inner leg, and tenderness on multiple areas of her head.

Finally, Moore's account was that Doe "got hostile" after she realized that Moore could supply no more crack and, after leaving the house, began yelling for help. Moore significantly failed to explain why Doe would make false accusations of various sexual assaults simply because she was angry that he had no more drugs to provide her. His account conflicts with that of Kohn and Snyder, who found Doe to be upset, not angry.

There was no reasonable probability that, absent the testimony that Moore has called into question, the jury would have reached a different outcome. Moore has failed to make a prima facie showing of prejudice and we have denied his petition for writ of habeas corpus in a separate order.

11

Moore, 2013 WL 5936676, at **13–14.

### C. Analysis of Petitioner's Claims

#### 1. Strickland Claims

##### a. Trial counsel improperly impeached his own client

Petitioner claims that trial counsel was constitutionally ineffective because counsel improperly introduced evidence of Petitioner's prior convictions for impeachment purposes, which consequently "'opened the door' . . . for a hungry and vicious prosecutor to devourer (sic)" Petitioner while counsel "sat by silently viewing the carnage initiated by his professional strategic, zealous ignorance." Pet. at 6.3. Petitioner argues that the California Court of Appeal erred in rejecting the claim and specifically erred in rejecting the claim under the prejudice prong of Strickland without also considering whether counsel's performance was deficient. Petitioner's claim is without merit.

The California Court of Appeal's rejection of Petitioner's claim on the ground that Petitioner did not establish prejudice was not an objectively unreasonable application of Strickland. See 28 U.S.C. § 2254(d); Harrington, 562 U.S. at 101. The state court focused on the substantial evidence of Petitioner's guilt in reasonably determining that there was no reasonable probability that, absent counsel's allegedly improper questions about Petitioner's prior convictions, the fact finder would have had a reasonable doubt respecting guilt. See Strickland, 466 U.S. at 695; Luna, 306 F.3d at 961. The court correctly noted that the victim's testimony was corroborated by the testimony of other witnesses whereas Petitioner's account was seriously undermined by the testimony of the other witnesses. Among other things, Petitioner's account conflicted not only with Doe's and Pleas's testimony, but also with Lattier's; Petitioner's account of Pleas's son breaking into the bedroom and talking with Pleas's son on the landing for two hours conflicted not only with Doe's and Pleas's testimony, but with that of Pleas's son as well; Petitioner stated that he hit only Doe's face out of reflex, but this did not explain all of Nurse Noey's observations, which included redness on Doe's left upper arm, bruising on her right thigh and inner leg and tenderness on

multiple areas of her head; Petitioner failed to explain why Doe would make false accusations of various sexual assaults simply because she was angry that Petitioner did not provide more drugs; and Petitioner's account that Doe "got hostile" conflicted with that of Kohn and Snyder, who found Doe to be upset, not angry. See Moore, 2013 WL 5936676, at *14. Under the circumstances, it cannot be said that the state court of appeal unreasonably concluded that there was no reasonable probability that, absent the questions and resulting testimony that Petitioner has called into question, the jury would have reached a different outcome. See Harrington, 562 U.S. at 101; Strickland, 466 U.S. at 695.

Petitioner is not entitled to federal habeas relief on his claim that trial counsel improperly impeached him. See 28 U.S.C. § 2254(d). That the California Court of Appeal did not consider whether counsel's performance was deficient, in addition to considering whether Petitioner was prejudiced by counsel's performance, does not compel a different conclusion because it is well settled that courts may consider either prong of Strickland first and need not address both prongs if the petitioner fails under one. See Strickland, 466 U.S. at 697.

    b. <u>Trial counsel improperly introduced Petitioner as "one of those people that you love to hate"</u>

Petitioner claims that trial counsel was constitutionally ineffective because he improperly introduced Petitioner to the jury as "one of those people that you love to hate," which "effectively demoniz[ed]" Petitioner. Pet. at 6.4. The claim is without merit because the California Court of Appeal's rejection of the claim on the ground that Petitioner did not show prejudice was not an objectively unreasonable application of Strickland. See 28 U.S.C. § 2254(d); Harrington, 562 U.S. at 101. In view of the substantial evidence of Petitioner's guilt, as noted above, it simply cannot be said that the state court of appeal unreasonably concluded that there was no reasonable probability that, absent trial counsel's introduction, the jury would have reached a different outcome. See Harrington, 562 U.S. at 101; Strickland, 466 U.S. at 695. Petitioner is not entitled to federal habeas relief on his claim that trial counsel improperly introduced him to the jury. See 28 U.S.C. § 2254(d).

13

         c.       Trial counsel failed to challenge an improper five-year enhancement at sentencing

Petitioner claims that trial counsel was constitutionally ineffective because he failed to challenge an improper enhancement at sentencing. See Pet. at 6.2–6.3. But the record makes clear that the California Court of Appeal vacated the improper five-year enhancement at issue on direct appeal. See Moore, 2013 WL 5936676, at **11–12. Petitioner's claim must be dismissed as moot. See Alvarez v. Smith, 558 U.S. 87, 93 (2009) (a claim is moot if it is "no longer embedded in any actual controversy about the [party's] legal rights"); United States v. Franklin, 235 F.3d 1165, 1173 (9th Cir. 2000) (upholding dismissal of defendant's claims of ineffective assistance of counsel as moot, where trial counsel's ineffectiveness had been cured by resentencing and reinstatement of direct appeal).

         d.       Trial counsel failed to correct jury instruction regarding count four

Petitioner claims that trial counsel provided ineffective assistance by failing to correct an erroneous jury instruction regarding count four: attempted rape by foreign object in concert. See Pet. at 6.3. But the record makes clear that the California Court of Appeal recognized instructional error in connection with count four on direct appeal and vacated the conviction and sentence on it. See Moore, 2013 WL 5936676, at **9–10. Petitioner's claim must be dismissed as moot. See Franklin, 235 F.3d at 1173.

      2.      Cronic Claim

Petitioner claims that prejudice must be presumed under Cronic in his case because trial counsel failed to subject the prosecution's case to meaningful adversarial testing by improperly impeaching his own client and thereby "effectively acting as second prosecutor." Pet. at 6.3–6.4. The claim is without merit.

It is well established that where counsel's conduct is egregiously prejudicial no showing of prejudice is required and ineffective assistance of counsel is presumed. See Cronic, 466 U.S. at 658–62. But this presumption is limited to those rare cases where

counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." Id. at 659. See, e.g., United States v. Swanson, 943 F.2d 1070, 1074 (9th Cir. 1991) (prejudice presumed where counsel conceded in argument to jury that there was no reasonable doubt regarding key factual issue in dispute and thereby lessened government's burden of proof); Javor v. United States, 724 F.2d 831, 833–34 (9th Cir. 1984) (prejudice presumed where counsel sleeps through substantial portion of trial).  Or, as the Supreme Court more recently put it, Cronic's presumption of prejudice applies only where the attorney's failure is "complete." Bell v. Cone, 535 U.S. 685, 696–97 (2002) (court must consider proceeding as a whole; that counsel failed to subject prosecution's case to meaningful adversarial testing only at some point generally does not trigger Cronic's presumption of prejudice).

Petitioner's claim that trial counsel improperly impeached his own client is not entitled to Cronic's presumption of prejudice because counsel's alleged failure was not a complete failure to subject the prosecution's case to meaningful adversarial testing. See id. The record shows that trial counsel's introduction of the facts surrounding Petitioner's prior convictions was a tactical decision—counsel "believed that the facts of the prior convictions, especially the manslaughter, were prejudicial and the prejudice would be minimized if [he] introduced them." Pet. Ex. D (Andrews Decl.) at 1.  If counsel's decision amounted to deficient performance, Petitioner still would have to establish prejudice under Strickland. See United States v. Thomas, 417 F.3d 1053, 1056, 1058–59 (9th Cir. 2005) (counsel's concession of guilt without consulting with defendant or obtaining his consent was deficient, but defendant still must prove prejudice under Strickland because the "concession was not the functional equivalent of a guilty plea, nor did it abandon all meaningful adversarial testing of the prosecution's case, such that it would be Cronic error"); see also Florida v. Nixon, 543 U.S. 175, 190–91 (2004) (defense counsel's strategic decision to concede, at the guilt phase of trial, defendant's commission of murder, and to concentrate defense on establishing, at penalty phase, cause for sparing defendant's life, did not rank as failure to function in any meaningful sense as government's adversary).  Petitioner is not entitled to

federal habeas relief on his Cronic claim.  At minimum, the California Court of Appeal's decision to apply Strickland and not Cronic to the present case was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  See 28 U.S.C. § 2254(d); Young, 435 F.3d at 1043.[1]

## V.    CONCLUSION

After a careful review of the record and pertinent law, the Court is satisfied that the petition for a writ of habeas corpus must be DENIED.

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability under 28 U.S.C. § 2253(c) also is DENIED because Petitioner has not demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The Clerk shall enter judgment in favor of Respondent, terminate all pending motions as moot, and close the file.

**IT IS SO ORDERED.**

Dated: November 25th, 2015

CHARLES R. BREYER
United States District Judge

---

[1] In his traverse, Petitioner raises for the first time several new claims of ineffective assistance of counsel.  But because it is well established that a traverse is not the proper pleading to raise additional grounds for relief, the Court will not consider the newly proffered claims in Petitioner's traverse.  See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994).